IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHARLES A. DEBOW        :        CIVIL ACTION
                        :
    v.                :
                        :
JO ANNE B. BARNHART,    :        NO. 05-5168
Commissioner of           :
Social Security Administration  :

**REPORT AND RECOMMENDATION**

THOMAS J. RUETER              July 31, 2006
United States Magistrate Judge

        Plaintiff, Charles A. Debow, filed this action pursuant to 42 U.S.C. § 405(g),

seeking judicial review of the final decision of the Commissioner of the Social Security

Administration ("Commissioner") denying his claim for disability insurance benefits ("DIB")

under Title II of the Social Security Act ("Act").

        Each party filed a motion for summary judgment.  For the reasons set forth below,

this court recommends that plaintiff's motion for summary judgment be granted, the

Commissioner's motion for summary judgment be denied, and the matter be remanded in

accordance with this Report and Recommendation.

I.     **FACTUAL AND PROCEDURAL HISTORY**

        Plaintiff filed an application for DIB alleging disability due to depression, anxiety,

stress and fatigue.  (R. 13, 96, 115.)  The claim was denied initially on July 18, 2003.  (R. 81-84.)

A request for a hearing was timely filed on September 15, 2003.  (R. 85.)  A hearing was held on

January 14, 2004, before Administrative Law Judge ("ALJ") Diane Moskal, at which plaintiff,

represented by counsel, and a vocational expert ("VE"), Bruce Martin, testified.[1]  (R. 53-79.)  A

supplemental hearing was held on July 29, 2004, at which VE Carolyn Rutherford and medical

expert ("ME"), Sharon Wainright, M.D., testified.[2]  (R. 26-52.)  In a decision dated September

18, 2004, the ALJ found that plaintiff was not disabled under the Act.  (R. 10-23.)  The ALJ

made the following findings:

1. The claimant's earnings record establishes that he met the disability insured status requirements of the Act on December 18, 2002, and continues to meet them at least through the date of this decision.

2. The claimant has not performed any substantial gainful activity since December 18, 2002.

3. The medical evidence establishes that the claimant has severe depression which, over time, was diagnosed as a milder mood disorder, dysthymia.

4. The claimant has no documented severe physical impairments.

5. The claimant's ability to perform basic work activities has been more than minimally limited and, therefore, he has severe mental impairments.

6. The claimant's mental impairments have not been of sufficient severity such as to meet or equal the severities of any of the relevant impairments described in Appendix 1 to Subpart P of Regulations No. 4 of the Social Security Administration [sic].

7. The claimant's testimony cannot be fully credited.

---

[1]  Plaintiff was born on October 22, 1947; at the time of the hearing he was fifty-six years old.  (R. 14, 58, 96.)  Plaintiff has a high school degree with some college experience and professional certifications.  (R. 14, 22, 59-61, 121.)  He has past relevant work experience as a premier agent and financial planner.  (R. 14, 22, 46, 76-77, 122.)

[2]  Prior to the commencement of the supplemental hearing, the ALJ explained that it was her intention to hold the second hearing in May 2004, but plaintiff had travel plans.  The ALJ added that the second hearing was continued to allow plaintiff the opportunity to attend. However, the ALJ further indicated that "Mr. DeBow did not want to attend because I allowed the attorney to participate by conference phone, so therefore, we have the absence of the Claimant and we have Mr. Nelson by conference call."  (R. 30-31.)

8.    The claimant has the residual functional capacity to perform medium, unskilled work in a lower stress job environment where public contact is not intensive.

9.    The claimant's past relevant work was sedentary exertionally and skilled in nature.

10.   The claimant is unable to perform his past relevant work.

11.   The claimant is an individual of advanced age.

12.   The claimant has a high school education.

13.   The claimant has a work background that has not provided him with any transferable skills in view of his server [sic] mental impairment.

14.   Considering the claimant's age, education, past relevant work experience and assuming that he retained the residual functional capacity for a full range of medium work, Rule 203.15 of Table No. 3 of Appendix 2 to Subpart P of Regulations No. 4 would direct the conclusion that the claimant is not disabled.

15.   Considering the claimant's nonexertional limitations, there are a significant number of jobs at the medium, unskilled level which exist in the national economy which the claimant could perform.  Examples of such jobs are: cleaner, (30,000 regionally, 2,000,000 nationally); general laborer (8,000 regionally, 400,000 nationally); and packer (4,500 regionally, 300,000 nationally).

(R. 21-22.)

Plaintiff filed a request for review of the decision of the ALJ which was denied by the Appeals Council on July 29, 2005.  (R. 4-9.)  The ALJ's decision became the final decision of the Commissioner.  Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

3

II.   **STANDARD OF REVIEW**

The role of this court on judicial review is to determine whether there is substantial evidence in the record to support the Commissioner's decision.  Jesurum v. Sec'y of United States Dep't of Health and Human Serv., 48 F.3d 114, 117 (3d Cir. 1995).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate."  Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  Substantial evidence is more than a mere scintilla of evidence, but may be less than a preponderance of the evidence.  Jesurum, 48 F.3d at 117.  This court may not weigh evidence or substitute its conclusions for those of the fact-finder.  Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002) (citing Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied, 507 U.S. 924 (1993)).  As the Third Circuit stated, "so long as an agency's fact-finding is supported by substantial evidence, reviewing courts lack power to reverse . . . those findings."  Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1191 (3d Cir. 1986).

To be eligible for DIB, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A).  Specifically, the impairments must be such that the claimant "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).

Under the Act, the claimant has the burden of proving the existence of a disability and must furnish medical evidence indicating the severity of the impairment.  42 U.S.C. § 423(d)(5).  A claimant satisfies this burden by showing an inability to return to former work.  Rossi v. Califano, 602 F.2d 55, 57 (3d Cir. 1979).  Once this standard is met, the burden of proof shifts to the Commissioner to show that given the claimant's age, education, and work experience the claimant has the ability to perform specific jobs that exist in the national economy.  42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(f).

The Commissioner decided this matter by utilizing the five step sequential evaluation process established by the Department of Health and Human Services to determine whether a person is "disabled."  This process requires the Commissioner to consider, in sequence, whether a claimant: (1) is currently employed; (2) has a severe impairment; (3) has an impairment which meets or equals the requirements of a listed impairment; (4) can perform past relevant work; and (5) if not, whether the claimant is able to perform other work, in view of his age, education, and work experience.  20 C.F.R. § 404.1520.

## III.  **BACKGROUND**

### A.  **Testimony of Plaintiff, January 14, 2004**

Plaintiff was fifty-six years old at the time of the administrative hearing.  (R. 58.)  He resided with his wife and adult son.  Id.  Plaintiff completed high school and some college; he then pursued professional degrees related to the insurance and financial planning industries.[3]  (R.

---

[3]   The claimant explained that he was a Chartered Financial Consultant or "CHFC".  (R. 60-61.)  He was also a Chartered Life Underwriter or "CLU", and a credit estate planner, one of 1,200 or 1,500 in the nation.  (R. 61.)  In addition, plaintiff was a Prudential Enterprise Education Advocate; he was responsible for training and mentoring other employees in the company.  Id.

59.)  Plaintiff previously was employed by Prudential Insurance Company, but at the time of the

hearing he was receiving long-term disability payments.[4]  (R. 63.)  Plaintiff recounted that in

August 2002 a good friend passed away.  (R. 64-65.)  The following month, plaintiff's wife

advised him to consult with a physician since he began to experience panic attacks, profuse

sweating and weight loss.  (R. 65.)  Plaintiff underwent a full body MRI which revealed that he

had a polyp on his colon; the study otherwise was unremarkable.  (R.  65-66.)

Plaintiff was referred to Dr. Rex, a psychologist, by his family physician, Dr.

Kish.  (R. 66-67.)  Initially plaintiff saw Dr. Rex twice per week, but at the time of the hearing,

he attended sessions on a weekly basis.  (R. 68.)  Plaintiff was examined by Dr. Sadoff in

connection with his long-term disability application.  (R. 68-69.)  The ALJ asked plaintiff if he

had any observations regarding Dr. Sadoff's opinion that plaintiff could return to work in some

capacity within a year's time.  (R. 70-71.)  Plaintiff responded that Dr. Rex opined that he was

not ready to work.  (R. 71.)  Plaintiff added that he experienced difficulty socializing with friends

and family members and participating in hobbies.[5]

In response to questioning by his counsel, plaintiff related that he took Ambien to

help him sleep.[6]  Despite this medication, plaintiff awoke two to three times per night.  (R. 73.)

However, plaintiff added: "to be honest, I've never been a good sleeper.  I've always had

---

[4]      Plaintiff testified that Prudential "encouraged me to apply for Social Security. Well, actually, they encouraged me that [sic] from the beginning."  (R. 69.)

[5]      Plaintiff testified that the summer preceding the administrative hearing, he went to Sea Isle City, New Jersey and "there were weekends when I went down to my boat and never untied it from the dock."  (R. 72.)

[6]      Plaintiff also took Paxil to treat his anxiety and Bextra to treat his arthritis.  (R. 68.)

difficulty getting to sleep." Id.  Aside from fishing, plaintiff enjoyed reading, although he had

difficulty starting and completing books.  (R. 74.)  Plaintiff opined that he could not go back to

work, even in a less stressful position than he had at Prudential, because

> after thirty years, there's nowhere in town that I don't go or can't
> go or do go where customers, clients and former clients run into
> me and, you know, the next thing you know, they want to have the
> whole litany of what's going on and that, itself, beats me down.

(R. 75.)

### B.  Testimony of the Vocational Experts

At the first administrative hearing, VE Bruce Martin testified that plaintiff's past

relevant work as a financial planner was classified as skilled, sedentary work.  (R. 76.)  Mr.

Martin opined that the skills plaintiff acquired as a financial planner were not transferable to less

stressful work.  Mr. Martin reasoned that

> yes, there's certainly plenty of skills but the sales skills or the
> persuading of others don't lend itself [sic] to transferring without
> having the same stressors and the same actually [sic] elements of -
> - with the history, the work by history.  And the financial planning
> skills all require interpersonal skills to convey the information and
> to implement the information.

(R. 77.)  At the second administrative hearing, VE Carolyn Rutherford agreed that plaintiff's job

as a financial planner was characterized as skilled, sedentary work.  (R. 46.)  The ALJ posed the

following hypothetical question to the VE:

> So, if we have a person, we do not have documented physical
> restrictions on Mr. DeBow so we're working with that and if we're
> looking basically at unskilled work and we're looking at work
> which would be, you heard the testimony of Dr. Wainright, about a
> low stress work environment and, you know, avoiding any
> complexity, although it was unskilled work, one would think that,
> in itself, would avoid complexity, would there be medium level
> jobs which - - and also given Dr. Wainright's testimony that - - I

> know she said generally there are only mild social limitations, mild
> deficits of concentration, yet she did indicate that in terms of
> dealing with, you know, insurance business customers so I guess
> we're looking for also a medium level job that wouldn't involve, at
> the unskilled level, sort of constant public contact.  We'd want to
> avoid that, too.  Would you have - - in your opinion, would that
> permit, would that profile permit certain medium, unskilled work,
> Dr. Rutherford?

(R. 47.) VE Rutherford responded that the hypothetical individual would be capable of

performing the duties of cleaner, a medium level job which existed in significant numbers in the

national economies.  She added that the hypothetical individual also could perform the duties of a

general laborer or packer.  Id.  VE Rutherford reiterated that these jobs were both unskilled, low

stress positions.  (R. 48.)  The VE explained that she did not identify other unskilled jobs because

even some unskilled work involved regular interaction with the public which could increase

stress level.  Id.

    **C.**    **Testimony of Medical Expert, Sharon Wainright, M.D., July 29, 2004**

        Dr. Wainright, a board-certified psychiatrist, testified that plaintiff did not have

any psychiatric limitations on his activities of daily living.  (R. 38.)  Dr. Wainright considered the

medical evidence of record and testified that plaintiff

> suffered through a major depressive episode, which I gather started
> sometime in late '02, probably like September '02 - - and, since
> that time, he also has improved to some degree.  I guess so, that by
> July '03, when he saw Dr. Sadoff, it was also stated that major
> depression to a dysthymic disorder or chronic kind of depressive
> episode and, in addition, there's a secondary diagnosis on the chart
> which would be a generalized anxiety disorder.  There's mention to
> [sic] a panic disorder.  No one talks about panic attacks.  Nobody
> says anything about the frequency or any impact of the panic
> attacks.  They're not addressing that at all.  There's an awful lot
> about anxiety and I think generalized anxiety disorder really fits the
> picture better than a panic disorder per se.

(R. 37.)  Dr. Wainright explained that although plaintiff would have a moderate impairment in social functioning in terms of interaction with clients, he otherwise would have a mild impairment in social functioning.  (R. 38.)  Dr. Wainright opined that plaintiff's depression and anxiety did not "objectively interfere" with his memory or concentration.  Id.  Dr. Wainright further explained that since plaintiff probably possessed better than average memory, concentration and focus in the past, he believed that he had suffered a loss of functioning in these abilities.  (R. 38-39.)  Dr. Wainright opined that plaintiff did not have any documented episodes of decompensation.  (R. 39.)

Dr. Wainright concluded that plaintiff did not have impairments which met or equaled the "B" or "C" criteria.[7]  (R. 40.)  Dr. Wainright acknowledged that plaintiff could no longer function as a "high-powered salesperson" and would be limited to working in a moderate to low stress environment.  (R. 40-41.)

### D.    Medical Evidence

Plaintiff visited Charles B. Kish, D.O., his primary care physician, in September 2002.  (R. 196.)  During that visit, plaintiff complained of fatigue, depression and stress for approximately one year; the death of a close friend exacerbated these complaints.  Id.  Dr. Kish diagnosed plaintiff with "fatigue and anxiety" and prescribed Paxil.  Id.  The following month, plaintiff informed Dr. Kish that he did not feel much better.  The physician diagnosed plaintiff with depression and fatigue and instructed him to continue to take Paxil and seek counseling.  (R. 194.)  In November 2002, plaintiff asked Dr. Kish for the name of another psychologist since

---

[7]    It appears from the testimony of Dr. Wainright that she was referring to the "B" and "C" criteria of the listing for depression.  (R. 39-40.)

plaintiff did not like the psychologist or psychiatrist whom he contacted.  (R. 192.)  Dr. Kish

recommended Sharon Rex, Ph.D., J.D., LL.M.[8]  Id.

On December 18, 2002, plaintiff met with Dr. Rex.  (R. 183-84.)  In treatment

notes, Dr. Rex indicated that plaintiff was seeking disability.  (R. 183.)  She related that plaintiff

was the "go to" guy at work but was unable to function at the time of his sessions with Dr. Rex.

Id.  Plaintiff reported that Paxil seemed to be helping his anxiety slightly, but he still was

nervous, exhausted and overwhelmed.  In addition, plaintiff reported difficulty sleeping.  Id.  Dr.

Rex's treatment note indicated that forms had to be filed with Prudential in connection with

plaintiff's disability claim.  (R. 184.)

During a follow-up visit the next month, plaintiff related that his goal was to be

named president of Prudential.  He referenced his thirty-two years with the company and

lamented his inability to "make a difference."  (R. 182.)  He desired to feel happy again, and

complained of decreased energy and low interest in activities he enjoyed previously.  However,

plaintiff reportedly read about fishing, boating and the Coast Guard.  Id.  During subsequent

visits with Dr. Rex in December 2002 and January 2003, plaintiff reported that during the

holidays he entertained but it was "too much" and the noise bothered him.  (R. 181.)  He also was

concerned that he would not get credit from Prudential for policy renewals while he was on

disability.  Id.  He described his love of the ocean and fishing.  (R. 180.)  He complained of

burnout, panic attacks and difficulty sleeping.  (R. 177-80.)

---

[8]      Dr. Rex's letterhead indicates that she offers or is associated with psychological
services, mediation and arbitration, general legal services and organizational development.  (R.
302.)

On January 28, 2003, plaintiff related that he was learning about anxiety.  He did not want to speak with people.  He was taking Ambien to help him sleep, and reported that it was "about time he got a good night's sleep."  (R. 175.)  Later that month, plaintiff appeared agitated and discussed how "fragile" he felt.  (R. 174.)  The following month, plaintiff was upset that his Prudential disability application had not been approved and concerned about his ability to pay his office manager.  (R. 173.)

On February 12, 2003, plaintiff informed Dr. Rex that he found it "very upsetting" that Reassure America was putting pressure on him.  (R. 172.)  Dr. Rex indicated that plaintiff "certainly" could return to work, but warned that it could be destructive.  Id.  Plaintiff related that he had been "running on fumes" for years and his friends "could see it coming."  Id.  The following day plaintiff reported that his depression was deep and pervasive.  He felt anxious and stressed after dealing with the family of a client who recently had passed away.  Plaintiff realized that he could not adhere to his prior schedule.  (R. 171.)  On March 25, 2003, plaintiff reported being stressed due to a "work engagement" that day which was "imperative."  (R. 170.)

The only notation from an April 24, 2003 visit with Dr. Rex indicated that plaintiff had gone to the Social Security office and was "very anxious."  (R. 264.)  During his next visit, plaintiff was distressed since he had not heard from his insurance company.  He also reported "aches all over."  (R. 263.)  On May 1, 2003, Dr. Rex reported that plaintiff's benefits would "run out" if he continued with two therapy sessions per week; she suggested limiting them to one per week.  Plaintiff relayed that his anxiety escalated when he thought of phone contacts and was troubled by his inability to return phone calls.  (R. 262.)

Michael Layne, Ph.D., evaluated plaintiff on May 29, 2003 at the request of the state agency; his report was dictated on June 4, 2003.  (R. 211-15.)  During the evaluation, plaintiff described himself as a "high energy" insurance salesman who had worked six day a week for thirty years.  (R. 211.)  He informed Dr. Layne that he had lost interest in doing things he loved, like deep sea fishing.  Id.  Plaintiff also indicated that he did not like to be around people because he had to explain why he was not working.  (R. 212.)  Plaintiff reported that his medication helped to calm him down, and that therapy also was beneficial.  Id.

Dr. Layne reported that plaintiff was "mildly anxious" but became more relaxed as the evaluation continued.[9]  (R. 212-13.)  Dr. Layne assessed plaintiff with a GAF score of fifty-five.  (R. 214.)  In terms of making occupational adjustments,  Dr. Layne concluded that

---

[9]     Dr. Layne wrote:

Mr. DeBow described himself as being very anxious, depressed, and constantly worried about his condition.  He feels unable to relax and lacks pleasure and motivation to perform daily activities.

His affective expression was moderately restricted but appropriate.  He denied any suicidal ideation.  There is no evidence of any perceptual disturbances, past to present.  His thought processes were intact, logical, productive, relevant, and goal-directed.  No language impairments were present.  Mr. DeBow says he thinks a lot about his current emotional state, what he has lost, not being able to work, and about his future mental and financial state.  There are no thought disturbances present.  He was capable of abstract thinking and his knowledge was commensurate with his age, experiences, and education.  He was able to successfully perform serial 7's although he reported problems in concentration.  For example not being able to read magazines, books or insurance claims.  He was oriented to time, place and person.  Remote, recent past, and recent memory functions were intact.  He did report, though, problems with daily memory, for example, walking up the stairs and forgetting why he went up.  There was no evidence of problems controlling hostile, aggressive, or sexual impulses.  Social and test judgment were intact.

(R. 213.)

plaintiff had a fair ability to follow work rules, relate to co-workers, deal with the public, interact with supervisors and function independently.  (R. 216.)  Dr. Layne opined that plaintiff had poor or no ability to use judgment, deal with work stresses or maintain attention or concentration.  Id. With respect to making performance adjustments, Dr. Layne indicated that plaintiff had a good ability to understand, remember and carry out simple job instructions; a fair ability to understand, remember and carry out detailed but not complex job instructions; and poor or no ability to understand, remember and carry out complex job instructions.  Id.  Regarding the ability to make personal-social adjustments, Dr. Layne determined that plaintiff had a fair ability to relate predictably in social situations, demonstrate reliability and behave in an emotionally stable manner.  (R. 217.)  He found plaintiff had a good ability to maintain personal appearance.  Id.

On June 25, 2003, Mitchell Sadar, Ph.D., reviewed plaintiff's medical records, including the report of Dr. Layne.  (R. 218-49.)  Dr. Sadar concluded that plaintiff had moderate restrictions in activities of daily living and marked difficulties in maintaining social functioning and in maintaining concentration, persistence or pace.  Dr. Sadar advised that "it is expected that he will progress and attain a functioning level that will allow him to reenter the workforce but at a less demanding level.  Claimant had been working 60-70 hours a week."  (R. 220.)

On July 1, 2003, plaintiff reported that he took an MMPI-2 test and found it stressful.  He reported night sweats, anxiety and lower energy.  He notified Dr. Kish and his dosage of Paxil was increased.  Plaintiff also expressed frustration with Reassure America since he had complied with all regulations.  (R. 261.)  On July 8, 2003, plaintiff's spirits were slightly improved, but he had very limited interest and energy for his usual activities.  He reported night sweats and difficulty sleeping.  (R. 260.)  On July 15, 2003, Dr. Rex reported that plaintiff

"switched to long term disability." (R. 259.) Plaintiff related that on one occasion he thought about suicide after reading a book his brother-in-law gave him. However, plaintiff explained that he had not caught "Bubba yet–I gotta stay. Even if I catch Bubba, I'll say there's a bigger Bubba out there."[10] (R. 259.)

On July 29, 2003, plaintiff was examined by Robert Sadoff, M.D., a board-certified psychiatrist.[11] (R. 266-78.) During the evaluation, plaintiff spoke of his successful career at Prudential, and how younger agents aspired to become as successful as he was. (R. 269-70.) He added that he had always put the needs of others first, and concluded that it was "now time to take care of himself." (R. 272.) Dr. Sadoff noted no deficits in plaintiff's mental status examination and did not observe any behavior or activity that related to any restrictions or limitations. Id. Dr. Sadoff diagnosed plaintiff with depressive symptoms which he no longer considered to be a major depressive disorder. Dr. Sadoff preferred the diagnosis of dysthymia. Id. Dr. Sadoff concluded that plaintiff was able to return to work, albeit not at the level he was able to handle previously. (R. 277.)

On September 20, 2003, plaintiff informed Dr. Rex that Paxil was "of small benefit in calming him down." (R. 258.) He continued to experience night sweats and disturbed

---

[10]     During his July 30, 2003 visit with Dr. Sadoff, plaintiff reported that he was not seriously considering hurting himself. He explained that "Bubba" was the big fish he had yet to catch. (R. 273.)

[11]     Dr. Sadoff reported that plaintiff presented his difficulties in a clear and relevant manner, without evidence of psychotic thought disorder, hallucinations, or delusions. (R. 266.) According to Dr. Sadoff, plaintiff was well oriented and his memory was not impaired, although he claimed to have difficulty with concentration and memory. Plaintiff had flexibility of affect and had the ability to respond to humor. Id. Plaintiff was articulate and well spoken. He showed some signs of anxiety and indicated that he was nervous about the examination. Id.

14

sleep, but he was informed by Dr. Kish that these may pass.  He had little spurts of energy, but overall he lacked interest in activities he enjoyed previously.  Id.  During the following visit, plaintiff once again complained about the treatment he received from Reassure America; this increased his stress level.  Although he had noticed a slight increase in his energy level, he still experienced night sweats.  He was distracted and experienced memory problems.  Plaintiff avoided crowds since he was "unable to deal with people in large doses."  (R. 257.)

On September 16, 2003, plaintiff discussed the disability process with Dr. Rex and complained that he was "frazzled" by the process.  He received a letter from Prudential, discarded it, and went to the shore.  (R. 256.)  Dr. Rex also discussed Dr. Sadoff's report with plaintiff.  Dr. Rex's notes indicated that the only thing missing from the report was "the fact that anything negative/pressuring immediately sets him into a tailspin and sets him back."  Id.  During the next visit, Dr. Rex noted a slight improvement in plaintiff's condition.  (R. 255.)  On October 16, 2003, Dr. Rex reported that plaintiff had a flat affect; he had a very bad week and was aggravated by Prudential and Reassure America.  (R. 254.)

On October 27, 2003, Dr. Rex completed a Physician's Statement wherein she checked numerous boxes and ultimately concluded that plaintiff met a listing.  (R. 250-52.)  Dr. Rex indicated that plaintiff had depressive symptoms including anhedonia, sleep disturbance, psychomotor agitation, feelings of guilt or worthlessness and difficulty concentrating or thinking. (R. 250.)  She further reported that plaintiff had generalized persistent anxiety which was accompanied by motor tension, autonomic hyperactivity and apprehensive expectation.  (R. 251.) She concluded that these impairments resulted in marked restrictions of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration,

persistence or pace and one or two repeated episodes of decompensation. (R. 251-52.) The following day, Dr. Rex noted that plaintiff was building a shed and felt it was good to do physical labor. (R. 324.) In November 2003, plaintiff advised that he was feeling "pretty good" although he still complained of night sweats. He took his boat out of the water and was looking forward to getting away with friends. (R. 319.) He also reported doing physical labor which was "somewhat therapeutic." Id.

Paul Moberg, Ph.D., a board-certified clinical neuropsychologist, evaluated plaintiff on November 5, 2003 and November 6, 2003. (R. 326-33.) Dr. Moberg related plaintiff's medical history of depression and anxiety. (R. 326-27.) Dr. Moberg administered a battery of tests and found that plaintiff was within the high average range of intelligence and had no measurable cognitive deficits. He diagnosed plaintiff with dysthymic disorder and panic disorder. Dr. Moberg related that plaintiff's reported trait anxiety was extremely high, but his anxiety at the time of testing was average. (R. 332-33.) Dr. Moberg reported the following:

> In summary, there are no significant neurocognitive or emotional deficits that would prevent Mr. DeBow from returning to his prior occupation at this time. The aforementioned emotional concerns should be readily treatable with appropriate pharmacologic and therapeutic intervention, but are not of the magnitude that they would prevent him from returning to his previous activities and employment.

(R. 333.)

On December 9, 2003, Dr. Rex's treatment notes indicated that plaintiff felt better after spending time away with friends. (R. 318.) Later that month, plaintiff told Dr. Rex that he was upset because he received a letter from Reassure America which indicated that behavioral treatment would not address his "burnout factor." (R. 317.) On January 12, 2004, plaintiff

16

informed Dr. Rex that he still had not heard from Reassure America and that he had a Social Security hearing.  (R. 316.)  He indicated that his holidays were good and he was working on wiring his boat.  He planned to attend Captain's school, but was uncertain if he could handle a full day of school.  Id.  Plaintiff was looking forward to the summer and fishing on a regular basis.  He felt a benefit from his medications and also saw a benefit in "not avoiding people."  Id.  His appetite had improved and the "knot is leaving my stomach."  (R. 315.)

On January 20, 2004, Dr. Rex wrote a letter to ALJ Moskal.  (R. 313-14.)  Dr. Rex related that she continued to treat plaintiff and that his depression and exhaustion continued to improve due to rest and the adjustment of psychotropic medications.  (R. 313.)  While he continued to experience difficulty in group settings, Dr. Rex noted a slight improvement in this area.  Id.  Dr. Rex concluded that "Mr. DeBow is unable to return to work at this time; however, I am hopeful that he will be able to do so in the future, if his depression and burnout continue to improve."  Id.

On January 23, 2004, plaintiff was evaluated by Jason Walker, Ed.D., C.R.C., C.C.M., a vocational counselor.  (R. 158-64.)  After administering a variety of tests, Mr. Walker wrote a letter to Dr. Rex and opined that plaintiff "cannot work at this time, certainly not in the work for which he is best qualified."  (R. 163.)  Mr. Walker added that he "wholeheartedly recommend[ed] that Mr. DeBow remain in your care."  Id.

On February 3, 2004, Dr. Rex wrote another letter to ALJ Moskal.  (R. 302-03.) Dr. Rex expressed her disagreement with the opinion of Dr. Moberg.  (R. 302-03.)  Dr. Rex opined that plaintiff did not possess the physical or mental stamina to perform "his employment functions."  (R. 302.)  Dr. Rex concluded that plaintiff was "quite fragile and, if he were to return

17

to work at this time, there is a high probability that he would suffer serious relapse, and possibly irreparable harm." Id. Dr. Rex further explained that "psychometric devices" were "not with the purview of her practice expertise." (R. 303.) Hence, she had referred plaintiff to Jason Walker, a vocational consultant and counselor. Id.

On February 10, 2004, Dr. Rex reported that plaintiff's anxiety was "really bad" and that he possessed no energy to keep abreast of the skills required in his job. (R. 301.) On February 24, 2004, Dr. Rex indicated that plaintiff was upset by the surveillance which was being conducted by Prudential. However, she indicated that plaintiff's energy had improved. (R. 300.) On March 2, 2004, Dr. Rex noted that plaintiff had gained weight and when "stress is lowered the knot is gone from his stomach and he has improved appetite." (R. 299.) Plaintiff informed Dr. Rex of his plans to attend "sea school." Id. On March 9, 2004, plaintiff relayed to Dr. Rex that he had shut people out due to his burnout and depression. (R. 298.) On March 23, 2004, plaintiff reported that the mental challenges of sea school were "undoable." (R. 297.) Plaintiff was frustrated by the number of errors he committed during the course and vowed to find new outlets because he was not capable of participating in his old activities. Id.

On April 6, 2004, plaintiff informed Dr. Rex that his claim was denied by Reassure America, an event he found extremely distressing. (R. 295.) He also was told that he needed a mental capacity evaluation in connection with his social security application. Id. In response to that request, Dr. Rex completed an Assessment of Ability to Do Work Related Activities. (R. 293-95.) Dr. Rex noted as "good" plaintiff's ability to: understand, remember and carry out simple job instructions; perceptual or thinking disturbances; persistence; and

reading ability.[12]  According to Dr. Rex, plaintiff's ability to perform the following was fair:

understand, remember and carry out detailed, but not complex, job instructions; ability to retain

orientation; memory impairment; emotional lability; perceptual or thinking disturbances (when

stressed or exhausted); and maintain attention/concentration.  Id.  Dr. Rex indicated that plaintiff

had no or poor ability to understand, remember and carry out complex job instructions or to deal

with full-time work stresses.  Id.

        In April 2004, plaintiff discussed his contact with the Insurance Commissioner

regarding his treatment by Reassure America which he considered "preposterous."  (R. 290.)  He

further discussed his anxiety over financial struggles.  (R. 289-92.)  In May 2004, plaintiff related

that a family gathering was good and he felt more relaxed in the group atmosphere.  (R. 289.)  He

was instructed not to "stew" over the denial by Reassure America.  Id.  On May 18, 2004,

plaintiff reported feeling calmer and more tolerant, although he worried and did not feel happy.

(R. 288.)  On May 25, 2004, Dr. Rex reported that plaintiff was "still not really back to his

interest in usual activities like the pile of magazines next to his chair."  (R. 287.)  Plaintiff related

that his depression zapped his energy.  Id.  On June 1, 2004, plaintiff reiterated his frustration

over his treatment by Reassure America.  (R. 285.)  Dr. Rex indicated that plaintiff's medications

did not require titration, and that plaintiff had gained weight.  Id.  Plaintiff complained about his

lack of concentration and memory required to complete some tax paperwork.  Id.  On June 15,

---

[12]    These answers were in response to a question which asks the evaluator to "check the items which reflect Mr. DeBow's mental/emotional ability to adjust to a job."  (R. 294.)  In response to a question which asked the evaluator to check the items which reflected Mr. DeBow's ability to adjust personally and socially, Dr. Rex concluded that plaintiff's had good ability to maintain personal appearance, behave in an emotionally stable manner and demonstrate reliability.  (R. 293.)  She concluded that he had a fair ability to relate predictably in social situations.  Id.

2004, Dr. Rex indicated that plaintiff was less anxious and his breathing had improved; she noted

that he needed to improve his energy level.  (R. 283.)  Plaintiff's spirits were better because he

got his boat into the water.  Id.  Dr. Rex assigned plaintiff a GAF of fifty, and indicated that his

concentration and memory were not good.  Id.  During the following visits, plaintiff continued to

complain of low energy and felt uncomfortable when asked how he was doing.  (R. 281-82.)

       One June 29, 2004, plaintiff informed Dr. Rex that he had felt more comfortable

on a fishing excursion with friends from Prudential.  (R. 281.)  He also indicated that he felt

frustrated that he had to take money from his pension fund in order to pay his taxes.  Id.  He was

working on his boat.  Id.  Dr. Rex indicated that plaintiff lost his train of thought several times

during the therapy session.  Id.  On July 27, 2004, Dr. Rex reported that plaintiff was very

anxious and had withdrawn from social situations.  (R. 280.)

## IV.   DISCUSSION

       Plaintiff presently contends that substantial evidence does not support the ALJ's

decision that plaintiff is not disabled.  Specifically, plaintiff argues that the ALJ erred when she

failed to discuss the severity of plaintiff's anxiety disorder.  (Pl.'s Br. Supp. Summ. J. at 17-20.)

Moreover, plaintiff avers that the ALJ "erred in finding the plaintiff not credible."  Id. at 15-17.

Finally, plaintiff complains that the ALJ's RFC assessment was inadequate since she failed to

consider plaintiff's physical impairments.  Id. at 13-15.

### A.   Severity of Mental Impairment

       Plaintiff argues the ALJ erred by finding that plaintiff's anxiety disorder was not a

severe mental impairment under the Commissioner's regulations.  Moreover, plaintiff avers that

the ALJ's failed to discuss what impact, if any, plaintiff's anxiety had on his ability to perform

work.  (Pl.'s Br. Supp. Summ. J. at 17-20.)  In response, defendant contends that substantial

evidence in the record supports the ALJ's disability determination.  (Def.'s Br. Supp. Summ. J. at

14-19.)

At step two of the sequential analysis, the ALJ must determine whether the

claimant has a severe impairment, or combination of impairments, which significantly limits the

claimant's physical or mental ability to do basic work activities.  20 C.F.R. §§ 404.1520©),

404.1520a.  When evaluating the severity of mental impairments, the Commissioner must follow

a "special technique."[13]  20 C.F.R. § 404.1520a(a).

Regarding the proper analysis at step two, the Third Circuit has stated that the

"burden placed on an applicant at step two is not an exacting one."  McCrea v. Comm'r of Soc.

Sec., 370 F.3d 357, 360 (3d Cir. 2004).  An applicant need only demonstrate something beyond

"a slight abnormality or a combination of slight abnormalities which would have no more than a

minimal effect on an individual's ability to work."  Id. (citing SSR 85-28, 1985 WL 56856, at

*3).  Reasonable doubts regarding the severity of the impairment are to be resolved in favor of

---

[13]  The Commissioner first must evaluate the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment.  20 C.F.R. § 404.1520a(b)(1).  Then, the Commissioner will rate the degree of functional limitation resulting from the impairments based on the extent to which the impairment interferes with the claimant's ability to function independently, appropriately, effectively and on a sustained basis.  20 C.F.R. § 404.1520a(b)(2).  There are four functional areas in which the degree of functional limitation will be rated: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  20 C.F.R. §§ 404.1520a(c)(3), 404.1520a(d).  If the degree of limitation in the first three functional areas is rated as "none" or "mild" and "none" in the fourth area, the impairment will generally be deemed not severe, unless the evidence otherwise indicates that there is more than a minimal limitation on the claimant's ability to do basic work activities.  20 C.F.R. § 404.1520a(d)(1).  Basic work activities include, inter alia, understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting.  20 C.F.R. § 404.1521(b)(1).

the applicant.  Id. (citing Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 546-47 (3d Cir. 2003)).

The Third Circuit has further clarified:

> Due to this limited function, the Commissioner's determination to deny an
> applicant's request for benefits at step two should be reviewed with close scrutiny.
> We do not suggest, however, that a reviewing court should apply a more stringent
> standard of review in these cases.  The Commissioner's denial at step two, like
> one made at any other step in the sequential analysis, is to be upheld if supported
> by substantial evidence in the record as a whole.  See Williams v. Sullivan, 970
> F.2d 1178, 1182 (3d Cir. 1992) ("Neither the district court nor this court is
> empowered to weigh the evidence or substitute its conclusions for those of the
> fact-finder.").  Instead, we express only the common-sense position that because
> step two is to be rarely utilized as [a] basis for the denial of benefits, see SSR 85-
> 28, 1995 WL 56856, at *4 ("Great care should be exercised in applying the not
> severe impairment concept."), its invocation is certain to raise a judicial eyebrow.

Id. at 360-61.

In the present case, the ALJ determined at step two of the analysis that plaintiff's

depression was a severe impairment.  (R. 15.)  However, the ALJ did not indicate in her opinion

whether plaintiff's anxiety was severe.  Id.  While the ALJ mentioned plaintiff's anxiety disorder

in her opinion, and in her findings concluded that "claimant's mental impairments have not been

of sufficient severity such as to meet or equal the severities of any of the relevant impairments

described in Appendix 1 to Subpart P of Regulations No. 4 of the Social Security

Administration," she never determined the severity of plaintiff's anxiety disorder.  (R. 22.)

The record contains numerous references to plaintiff's anxiety disorder.  (R. 37,

25-52, 277, 302, 332-33.)  Dr. Rex completed a Physician's Statement which indicated that

plaintiff suffered from an anxiety disorder and had symptoms which would meet the criteria of

Listing 12.06.[14]  (R. 250-52.)  Moreover, the ME testified at the administrative hearing that the

---

[14]     In her assessment, Dr. Rex indicated that plaintiff had generalized persistent
anxiety accompanied by: motor tension, autonomic hyperactivity and apprehensive expectation.

medical record contained "an awful lot about anxiety and I think generalized anxiety disorder really fits the picture better than a panic disorder, per se." (R. 37.) Dr. Moberg related that plaintiff's medical history included a diagnosis of depression and anxiety. (R. 332-33.)

Notwithstanding the numerous references to plaintiff's anxiety disorder, the ALJ neglected to analyze this impairment in her discussion. It is the responsibility of the ALJ to decide whether a listing is met or equaled after first determining the severity of a plaintiff's impairments. 20 C.F.R. § 404.1520(e); SSR 96-6p. An ALJ must compare the medical evidence in the record to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d). This requirement assures that the ALJ set forth reasons for her decisions. Burnett v. Comm'r of Soc. Sec. Administer., 220 F.3d 112, 118-19 (3d Cir. 2000). "Burnett does not require an ALJ to use 'magic language' or adhere to a particular analytical format. Rather, the purpose of Burnett is to ensure sufficient development of the record and explanation of findings to permit meaningful judicial review." Caruso v. Comm'r of Soc. Sec. Administer., 99 Fed. Appx. 376, 2004 WL 1147065, at *2 (3d Cir. 2004) (not precedential). Nevertheless, the ALJ must provide not only an expression of the evidence she considered which supports the result, but also some indication of the evidence which was rejected. Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981). "In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." Id.

_____

(R. 251-52.) Dr. Rex opined that these symptoms resulted in marked restrictions of activities of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence or pace, and one or two repeated episodes of decompensation of extended duration. Id. In her opinion, the ALJ incorrectly noted that no treating or examining physician had ever made findings equivalent in severity to the criteria of a listed impairment. (R. 15.)

An adequate discussion of plaintiff's anxiety disorder was omitted from the opinion of the ALJ.  Accordingly, the court therefore recommends that the case be remanded for further proceedings.  Upon remand, the ALJ should reconsider her determination at step two regarding plaintiff's anxiety disorder and then, if she finds that plaintiff had a severe impairment or combination of impairments, continue on with the sequential evaluation process.[15]

**B.    Credibility Assessment**

Next, plaintiff contends that the ALJ erred by providing an inadequate credibility assessment.  (Pl.'s Br. Supp. Summ. J. at 15-17.)  Specifically, plaintiff argues that the ALJ failed to analyze his subjective complaints, including his anxiety in social situations, fatigue and difficulty with concentration.  Id.  The Commissioner counters that the evidence of record supports the ALJ's credibility findings.  (Def.'s Br. Supp. Summ. J. at 21-23.)

It is within the province of the ALJ to evaluate the credibility of the claimant. Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983).  A claimant's testimony regarding subjective complaints is entitled to great weight when supported by competent medical evidence. Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979).  See also Burns, 312 F.3d at 129 (subjective complaints must be given "serious consideration") (citation omitted).  The Third Circuit has stated that "[a]llegations of pain and other subjective symptoms must be supported by objective medical evidence."  Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) (citing 20

---

[15]    This court finds, as the court did in Terwilliger, that "while the ALJ may have engaged in the appropriate legal analysis, such analysis is not apparent in his decision." Terwilliger v. Chater, 945 F. Supp. 836, 843 (E.D. Pa. 1996).  Without some explanation as to why certain evidence was rejected, this court cannot determine whether the decision of the ALJ was based upon substantial evidence.  Accordingly, this court recommends that the case be remanded to fully develop the record.

C.F.R. § 404.1529).  Once an ALJ determines that a medical impairment exists that reasonably

could cause the subjective symptoms, the ALJ "must evaluate the intensity and persistence of the

pain or symptom, and the extent to which it affects the individual's ability to work."  Id.  This

determination, the court continued, "requires the ALJ to determine the extent to which a claimant

is accurately stating the degree of pain or the extent to which he or she is disabled by it."  Id.

(citing 20 C.F.R. § 404.1529©)).

    An ALJ may disregard subjective complaints when contrary evidence exists in

the record.  Mason v. Shalala, 994 F.2d 1058, 1067-68 (3d Cir. 1993).  The ALJ must, however,

provide her reasons for doing so.  Burnett v. Comm'r of Soc. Sec. Administer., 220 F.3d at 122;

Matullo v. Bowen, 926 F.2d 240, 245 (3d Cir.1990) (noting that ALJ may reject claim of

disabling pain where he has considered subjective pain and specified his reasons for rejecting

these claims).

    As discussed supra, the ALJ failed to discuss the severity of plaintiff's anxiety.

That omission may impact the ALJ's determinations regarding plaintiff's credibility.  In light of

the court's recommendation that the case be remanded to the Commissioner for further

consideration of plaintiff's anxiety disorder, this court recommends that upon remand, the

Commissioner also reevaluate plaintiff's credibility.

**C.     Plaintiff's Physical Impairments**

    Finally, plaintiff contends that the ALJ failed to consider his physical impairments

when she evaluated plaintiff's residual functional capacity ("RFC").  (Pl.'s Br. Supp. Summ. J.

Mot. at 13-15.)  This court disagrees.  In her opinion, the ALJ concluded that plaintiff had "no

documented severe physical impairments," and added that the "claimant never alleged and the

record fails to support any physical disabilities." (R. 21.)  She referenced evaluations by Dr. Kish, plaintiff's treating physicians, which "failed to reveal any physical impairments." (R. 19.) Moreover, the ALJ referenced plaintiff's activities of daily living and lifestyle to support her findings regarding plaintiff's alleged physical impairments. (R. 16-21.)  Additionally, in his social security application, plaintiff did not list any physical impairments, and the medical record contains scant evidence regarding treatment for physical ailments.[16] (R. 115.)  Accordingly, this court finds that substantial evidence supports the determination of the ALJ regarding the severity of plaintiff's physical impairments and their effect on his ability to perform work.

## IV.   CONCLUSION

For all the above reasons, this court concludes that there is not substantial evidence to support the ALJ's decision denying plaintiff benefits.  Thus, this court recommends that plaintiff's motion for summary judgment be granted and the case be remanded pursuant to sentence four of 42 U.S.C. § 405(g) to further develop the record in accordance with this Report and Recommendation.  Accordingly, the court makes the following:

### R E C O M M E N D A T I O N

AND NOW, this 31st day of July, 2006, upon consideration of plaintiff's motion for summary judgment and defendant's motion for summary judgment, it is respectfully recommended that plaintiff's motion for summary judgment be GRANTED, defendant's motion

---

[16]    In his brief in support of his motion for summary judgment, plaintiff lists these impairments as arthritis in his shoulders, elbows and hands, osteoporosis and COPD. (Pl.'s Br. Supp. Summ. J. at 14.)  During the administrative hearing, plaintiff testified that he took Bextra for arthritis, and added that "probably doesn't matter [to] anybody." (R. 68.)  While medical testing revealed that plaintiff had reduced bone density and hyperinflated lungs compatible with COPD, (R. 205-06), there is no evidence that plaintiff received treatment for these conditions or that they impacted his ability to perform work activities.

for summary judgment be DENIED, and judgment be entered in favor of plaintiff.[17]  The court

further recommends that this case be REMANDED for further proceedings consistent with this

Report and Recommendation.

                              BY THE COURT:


                              /s/  Thomas J. Rueter
                              THOMAS J. RUETER
                              United States Magistrate Judge

---

[17]        Since the court recommends a remand pursuant to sentence four of 42 U.S.C. §
405(g), the court recommends that the motion for summary judgment be granted and judgment
be entered in plaintiff's favor.  See Shalala v. Schaefer, 509 U.S. 292, 296-97 (1993) (Sentence
four of 42 U.S.C. § 405(g) authorizes a district court to enter judgment "with or without" a
remand order, not a remand order "with or without" a judgment.)  See also Kadelski v. Sullivan,
30 F.3d 399, 401 (3d Cir. 1994).